A.B. REALTY CORP., Plaintiff,

v.

METROPOLITAN LIFE INSURANCE CO., Defendant–Third–Party Plaintiff,

v.

Anthony D. AUTORINO, Third–Party Defendant.

No. 3:98CV01592(GLG).

United States District Court, D. Connecticut.

Sept. 7, 2001.

James A. Budinetz, Pepe & Hazard, Hartford, CT, Robert L. Keepnews, Pepe & Hazard, Southport, CT, for AB Realty Corp.

Eric D. Daniels, Dina S. Fisher, Robinson & Cole, Hartford, CT, for Metropolitan Life Ins. Co.

Lisa Kelly Morgan, Maura Hughes Horan, Ruben, Johnson & Morgan, Hartford, CT, for Anthony D. Autorino.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GOETTEL, District Judge.

Following a three-day bench trial of this action, the submission of briefs on the legal issues, and after hearing oral argument, the Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Plaintiff A.B. Realty Corp. ("A.B.Realty") is a Connecticut corporation with its office and principal place of business in Hartford, Connecticut.

2. A. B. Realty is the surviving entity of a June 26, 1997, merger with Advest Credit Corporation ("Advest").

3. Defendant Metropolitan Life Insurance Company ("MetLife") is a New York corporation with its office and principal place of business in New York, New York.

4. Third–Party Defendant Anthony D. Autorino ("Autorino") is a citizen of Connecticut.

5. The amount in controversy in this action exceeds $75,000 exclusive of interest and costs.

6. Advest and Universal Trading Exchange, Inc. ("Univex") entered into a Credit Agreement dated June 3, 1987, pursuant to which Advest loaned to Univex funds in the approximate aggregate amount of $1,500,000 (the "Univex Loan").

7. In early 1988, Univex was negotiating with Advest in an effort to compromise or otherwise relieve itself of the indebtedness owed under the Univex Loan. At the time of these negotiations, Advest and Univex anticipated that Univex would be out of business by August 1988 unless Univex found an investor willing to invest a significant amount of money in Univex. If Univex went out of business, Advest would not likely be able to recover the money it had loaned to Univex under the Univex Loan.

8. In April and May, 1988, Autorino, a member of the Board of Directors of Univex, entered into discussions with Univex and Advest in an effort to resolve the financial issues between Univex and Advest. Ultimately, Autorino offered to purchase the Univex Loan from Advest and thereafter forgive Univex's indebtedness thereunder in exchange for certain shares of Univex stock and other accommodations. Univex, Advest, and Autorino agreed to the transaction.

9. On July 6, 1988, a financial transaction took place among Advest, Univex, and Autorino to restructure the prior debt owed from Univex to Advest.

10. On July 6, 1988, Autorino purchased the Univex Loan from Advest and entered into a Settlement Agreement with respect thereto with Univex.

11. In consideration of the purchase of the Univex Loan, Autorino executed and delivered to Advest a $1,500,000 non-re-

course promissory note (the "Secured Promissory Note") secured by three assets: (1) a $750,000 standby letter of credit issued by United Bank and Trust Company ("UBT") to Advest from Autorino's account (the "Letter of Credit"); (2) a security interest in and pledge of 850,000 shares of Univex stock (the "Pledged Securities"); and (3) a security interest in a $1,500,000 face amount annuity (the "Funding Agreement") to be purchased from MetLife by Drexel, Burnham and Lambert (a brokerage firm which had agreed to provide an infusion of equity capital to Univex) to the extent of $750,000.

12. At the time of the closing of that transaction, Autorino was still a member of the Univex Board of Directors.

13. As part of the closing, Autorino executed a Note Purchase Agreement, dated July 6, 1988, which stated, *inter alia*, that Autorino was executing and delivering to Advest "his pledge of a $1,500,000 face amount annuity issued to Autorino [sic] by Metropolitan Life Insurance Company to UNIVEX naming Autorino as payee . . . ."

14. As part of the closing, Autorino executed a Secured Promissory Note, dated July 6, 1988, obligating him to pay to Advest $1,500,000 in quarterly installments. The first such installment was due December 31, 1988, in the principal amount of $200,000. The last such installment was due June 30, 1990, in the principal amount of $250,000.

15. As part of the closing, Autorino executed a Pledge and Security Agreement, dated July 6, 1988, which stated, *inter alia*, that Autorino does further unconditionally and irrevocably hereby grant to [Advest] a security interest in and lien upon all of [Autorino's] right, title and interest in and to a certain $1,500,000 face amount annuity due and payable on July 7, 1998 and issued by Metropolitan Life Insurance Company ("Metropolitan") to [Univex] pursuant to Funding Agreement No. 9861–1 dated July 6, 1988 . . . and the proceeds thereof to the extent of $750,000. The Pledge and Security Agreement also referenced a "Metropolitan Letter" which, in the event of default, Advest could deliver to MetLife to assert its rights with respect to the collateral.

16. As part of the Settlement Agreement executed that day, Univex also issued 850,000 shares of Class A common stock (the "Pledged Securities"), which it gave to Autorino. These Pledged Securities were then delivered to the law firm of Updike, Kelly & Spellacy, P.C., as escrow agent, and placed in an escrow brokerage account, pursuant to the terms of an Escrow Agreement dated July 6, 1988, between Advest, Autorino, and Updike, Kelly & Spellacy, P.C.

17. As part of the closing, on July 6, 1988, MetLife issued to Univex, as Contractholder, Funding Agreement No. 9861–1, an annuity contract, whereby MetLife agreed to pay upon maturity the lesser of $1,500,000 or the payment made for the annuity plus interest at 9% as earned, less any withdrawals made by the Contractholder. Payment for the Funding Agreement was made by Drexel, Burnham & Lambert, in the amount of $633,616.00. The Funding Agreement matured on July 7, 1998, and contained, *inter alia*, the following provisions:

¶ 1.4 . . .

> The Contractholder may withdraw all or part of the amount held in the Funding Account as of any business day . . . upon three business days written notice to Metropolitan. . . . Metropolitan will withdraw the amount requested by the Contractholder (but not more than the Funding Account balance determined under

the following sentences) and will pay the Contractholder this amount multiplied by the Market Value Adjustment Factor (MVA Factor) ...

.   .   .   .   .

If any such withdrawal is made, Metropolitan will not pay $1,500,000 on July 7, 1998, but rather will pay the then balance in the Funding Account ...

.   .   .   .   .

Anthony Autorino and Advest Credit Corporation shall be joint payees of the amount payable on July 7, 1998. Any withdrawals prior to July 7, 1998 by the Contractholder shall require the joint written direction of Anthony Autorino, Advest Credit Corporation and the Contractholder.

¶ 2.3 Metropolitan has no obligation to inquire as to the authority of any payee to receive any payments made under this Agreement ....

18. In a letter dated July 6, 1988, Advest confirmed its agreement with Autorino that, upon the occurrence of an event of default, as defined in the Pledge and Security Agreement, Advest would realize the collateral securing the Note in the following order: (1) the Letter of Credit; (2) the Pledged Securities; and (3) the proceeds of the Funding Agreement. The Pledge and Security Agreement defined an "event of default" to include, *inter alia,* failure by Autorino to make any payment of any of the obligations "as and when due" under the Secured Promissory Note, which was a non-recourse note.

19. By letter dated September 30, 1988, Univex assigned its interest as Contractholder under the Funding Agreement to Autorino. MetLife and Advest consented to the assignment.

20. The first principal payment to be made under the Secured Promissory Note in the amount of $200,000 was due on December 31, 1988. On December 31, 1988, Autorino failed to make this first scheduled payment to Advest in the amount of $200,000. The Secured Promissory Note contained a ten-day grace period for payment of the sums due thereunder before the Note could be accelerated.

21. On January 9, 1989 (prior to the expiration of the ten-day grace period afforded under the Note), Advest made written demand for payment upon Autorino and declared all amounts due and owing under the Secured Promissory Note immediately due and payable. Advest also advised Autorino that it intended to pursue all of its rights and remedies under the Note and Pledge Agreement.

22. On January 11, 1989, Advest presented its sight draft to UBT and drew down upon the Letter of Credit in the amount of $750,000.

23. After Advest drew down on the Letter of Credit, Autorino entered into discussions with Advest in an attempt to have Advest reinstate the Note. No agreement was reached between Autorino and Advest.

24. By letter dated July 22, 1992, Autorino inquired of MetLife as to the current balance of the account and the amount that was presently available for withdrawal, leaving a balance of $750,000 upon maturity.

25. By letter dated August 11, 1992, Autorino requested that MetLife transfer to him via wire the amount of $448,892.91 under the Funding Agreement. Autorino implicitly represented that he had authority to make a withdrawal from the account in the amount of $448,892.91.

26. MetLife wired funds in the amount of $451,017.62 to Autorino on August 14, 1992 (the "First Withdrawal").

27. At trial, Autorino took the position that he was entitled to receive the First Withdrawal when he requested that the funds be transferred to him because he owned the Funding Agreement.

28. Advest did not find a buyer for the 850,000 shares of Pledged Securities, and they remained in escrow. The value of the stock, whatever it had been at the time it was pledged, declined, and by 1992, the stock had become worthless.

29. On May 6, 1994, Advest wrote to MetLife as part of an internal audit to confirm the terms of the Funding Agreement.

30. On July 14, 1994, MetLife notified Advest (and Advest learned for the first time) of the August 14, 1992, withdrawal by Autorino and that the revised maturity amount of the annuity on July 7, 1998 was $750,000.

31. On August 10, 1994, Advest's President, William F. Weaver, wrote to MetLife to complain that Advest had not authorized the earlier withdrawal and that the payment to Autorino was "in direct violation of the terms of the Agreement, which provides, in part, that 'Any withdrawals prior to July 7, 1998 by the Contractholder shall require the joint written direction of Anthony Autorino, Advest Credit Corporation and the Contractholder.'" Weaver's letter further stated that the proceeds of the Funding Agreement were to be shared "on a $^{50}\!/\!oo$ basis between Mr. Autorino and Advest." Mr. Weaver demanded that MetLife "revise the Agreement to provide that the full payment of $750,000 will be made on July 7, 1998 solely to Advest and provide further that the Agreement may not be amended or modified without the prior written consent of Advest."

32. In response to Advest's letter, Peter Vega, Account Manager of MetLife, in a letter to Advest dated November 9, 1994, stated that "[u]pon maturity the remaning [sic] half in the amount of $750,000.00 will be paid to Advest Credit Corporation. We apologize for any inconvenience this may have cause [sic]."

33. On or about May 23, 1997, Autorino wrote MetLife stating that he "would like to liquidate" the Funding Agreement and provided MetLife with wiring instructions for the transfer of the remaining funds in the Funding Account. At trial, Autorino took the position that he was entitled to these funds because he owned the Funding Agreement and, moreover, that Advest had no interest in the Funding Agreement.

34. MetLife, without the knowledge, authorization or direction of Advest, paid to Autorino the remaining balance of the Funding Agreement in the amount of $679,997.96 [the "Second Withdrawal"].

35. The debt from Autorino to Advest had been partially paid in the amount of $750,000 through Advest's calling of the Letter of Credit in January 1989.

36. On June 9, 1998, Advest, still unaware of Autorino's Second Withdrawal, wrote to MetLife directing it to pay the "entire remaining payment of $750,000" to A.B. Realty "without the need to obtain Mr. Autorino's written authorization."

37. Because of Autorino's two early withdrawals, no money remained in the Funding Agreement and MetLife paid nothing to Advest.

38. The balance of the debt from Autorino to Advest in the amount of $750,000 was never repaid, and Advest was damaged at least to that extent.

39. At no time prior to instituting suit did Advest notify MetLife that Autorino was in default on his obligations to Advest.

40. Advest never delivered to MetLife the Metropolitan Letter (referred to in the Pledge and Security Agreement), asserting

Advest's interests with respect to the Funding Agreement, as permitted in the Pledge and Security Agreement. The Metropolitan Letter, as drafted, had not been acceptable to Autorino and was never signed by him.

### CONCLUSIONS OF LAW

■ 41. The Court holds that the breach of contract claim asserted by Advest against MetLife is governed by New York law. A federal trial court sitting in diversity must apply the law of the forum state to determine the choice of law. *Klaxon Co. v. Stentor Electric Mftg. Co.*, 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Connecticut law "give[s] effect to an express choice of law by the parties to a contract provided that it was made in good faith." *Elgar v. Elgar*, 238 Conn. 839, 845, 679 A.2d 937 (1996). Because the Funding Agreement contained an express provision that it was to be governed by New York law, the Court applies New York law to Advest's breach of contract claim brought under the Funding Agreement.

■ 42. Under New York law, a non-party may sue for breach of contract only if it is an intended, and not a mere incidental, beneficiary. "An intended beneficiary will be found when it is appropriate to recognize a right to performance in the third party and the circumstances indicate that the promisee intends to give the third party the benefit of the promised performance." *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir.1991) (citing *Restatement (Second) of Contracts* § 302 (1981)). In determining third-party beneficiary status, New York courts look to the language of the agreement as well as to the surrounding circumstances. *Id.* Based upon the language of the Funding Agreement, as well as the circumstances surrounding

its formation, the Court finds that Advest is an intended third-party of the Funding Agreement. The Funding Agreement was entered into as part of the overall settlement agreement between Autorino, Univex, and Advest to provide Advest with additional collateral to secure the non-recourse promissory note given by Autorino to Advest. The Funding Agreement was an integral part of the settlement and was referenced in several of the closing documents, including the Pledge and Security Agreement, in which Autorino unconditionally and irrevocably gave Advest a security interest in the Funding Agreement annuity and the proceeds thereof to the extent of $750,000. Advest was expressly named as a joint payee in the Funding Agreement, which provided that all payments prior to maturity had to be approved in writing by Advest and Autorino. After the closing, MetLife signed off on the assignment from Univex to Autorino, which assignment specifically referenced the purpose of the Funding Agreement. As an intended third-party beneficiary, Advest is entitled to sue MetLife for breach of the Funding Agreement.

■ 43. The Court finds that MetLife breached the contractual obligations owing to Advest under the Funding Agreement by disbursing funds to Autorino without the written direction of Advest, as required by the Funding Agreement. As a result of the second disbursement to Autorino, the Funding Agreement became worthless, and Advest was damaged in the amount of $750,000, the amount that it would have received upon maturity of the Funding Agreement on July 7, 1998.

■ 44. Additionally, Advest has asserted a claim for negligence against MetLife. The Court holds that New York common law applies to this claim, since New York has the most significant relationship to the occurrences giving rise to

Advest's claim. *See O'Connor v. O'Connor,* 201 Conn. 632, 651, 519 A.2d 13 (1986) (adopting the most significant relationship approach of the *Restatement (Second) of Conflict of Laws* ). MetLife was located in New York and all communications to MetLife were sent to New York. The funds were disbursed to Autorino from New York.

45. Under New York law, in order to sustain a claim for negligence, a plaintiff must show that the defendant owed it a cognizable duty of care, that the defendant breached that duty, and that the plaintiff suffered damages as a result of that breach. *King v. Crossland Savings Bank,* 111 F.3d 251, 259 (2d Cir.1997). It is well settled that a simple breach of contract is not considered a tort unless a legal duty independent of the contract itself has been violated. *Clark–Fitzpatrick, Inc. v. Long Is. R.R. Co.,* 70 N.Y.2d 382, 389–390, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987). This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract. *Id.* Merely charging a breach of a "duty of due care" does not, without more, transform a simple breach of contract into a tort claim. *Id.* A duty extraneous to the contract often exists where the contract accompanies some relation between the parties out of which arises a duty of affirmative care, as in cases involving a bailor and bailee, public carrier and passenger, innkeeper and guest, lawyer and client, or principal and agent. *Broadway National Bank v. Barton–Russell Corp.,* 154 Misc.2d 181, 585 N.Y.S.2d 933, 943 (1992). In this case, the Court finds that Advest has established that MetLife owed it a duty of care arising out of obligations extraneous to the Funding Agreement itself.

46. Prior to the second disbursement of funds to Auterino, Advest wrote MetLife, which was holding funds for the benefit of Advest, complaining of the first disbursement and advising MctLife that this was in direct violation of the Funding Agreement. MetLife's representative responded to this letter assuring Advest that the remaining $750,000 would be paid to Advest upon maturity. MetLife, having been put on notice of the first breach of the Funding Agreement and having given written assurances that there would be no further breach of the Funding Agreement and that Advest would receive the proceeds of the Funding Agreement upon its maturity, assumed an extra-contractual duty to exercise due care in the administration of the Funding Agreement.

47. The Court finds that MetLife breached that duty of care owing to Advest when it made the second disbursement of funds to Autorino. As a direct and proximate result of this negligence, Advest was damaged in the amount of $750,000.

48. MetLife has asserted a third-party claim against Autorino for tortious conversion. We hold that Connecticut common law applies to this claim, because Connecticut has the more significant relationship with the events giving rise to this claim. All of the actions of Autorino took place in, or originated from, Connecticut. However, we note that the substantive law of New York and Connecticut is sufficiently similar that it is immaterial to the outcome of this claim which State's common law we apply.

49. Conversion is "any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." *Atlanta Shipping Corp. v. Chemical Bank,* 818

F.2d 240, 249 (2d Cir.1987) (applying New York law); *Aetna Life & Casualty Co. v. Union Trust Co.,* 230 Conn. 779, 790–91, 646 A.2d 799 (1994) (setting forth a similar definition under Connecticut law). The Court finds that MetLife has established that it was entitled to hold the funds in the Funding Agreement Account until such time as it was properly liquidated. Autorino represented to MetLife that he had the authority to withdraw all of the funds held by MetLife, when in fact, he was without authority to withdraw all of the funds without Advest's consent. By withdrawing the funds, Autorino deprived MetLife of funds that it would be required to pay over to Advest. Autorino's conduct in this regard was the direct and proximate cause of harm to MetLife. Accordingly, the Court holds that Autorino is liable to MetLife for the tortious conversion of $750,000, which was payable to Advest upon the maturity of the Funding Agreement.

■■■ 50. MetLife has also asserted a third-party claim for unjust enrichment against Autorino. Again, the Court holds that this claim is governed by Connecticut law. The doctrine of unjust enrichment "is based upon the principle that one should not be permitted unjustly to enrich himself at the expense of another but should be required to make restitution of or for property received, retained or appropriated." *Franks v. Lockwood,* 146 Conn. 273, 278, 150 A.2d 215 (1959). The right to recover under this doctrine is "essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." *Id.* (citations omitted). In order to create an obligation to make restitution, it is not necessary that the party unjustly enriched was guilty of fraud or any tortious act. "The question is: Did he, to the detriment of someone else, ob-tain something of value to which he was not entitled?" *Id.*

51. The Court holds that Autorino was unjustly enriched when he took monies held by MetLife pursuant to the Funding Agreement and liquidated the account in violation of the Pledge and Security Agreement with Advest. The Funding Agreement Account had been funded by monies paid in by Drexel Burnham Lambert and was intended to serve as collateral for the non-recourse debt owed by Autorino to Advest. Half of that debt, or $750,000, was never repaid by Autorino, and Autorino was unjustly enriched by receipt of the second disbursement from the Funding Account, which should have been disbursed to Advest upon maturity. In asserting a claim for unjust enrichment against Autorino, MetLife stands in the shoes of Advest. The Court finds that Autorino has been unjustly enriched to the extent of $750,000, which is the amount the Funding Agreement would have paid Advest upon maturity in satisfaction of the debt owing from Autorino to Advest. Therefore, Autorino is liable to MetLife in equity on its unjust enrichment claim.

■■ 52. MetLife has requested an award of prejudgment interest on its third-party claims against Autorino. An award of prejudgment interest under Connecticut law for the detention of money after it becomes payable is an equitable determination and a matter within the sound discretion of the Court. Conn. Gen.Stat. § 37–3a; *Prime Management Co. v. Stein-egger,* 904 F.2d 811, 817 (2d Cir.1990). The Connecticut courts have held that factors to be considered include whether the enrichment was unjust, whether the sum recovered is a liquidated amount, and whether the party seeking prejudgment interest has diligently presented the claim. The Court holds that under the circumstances of this case, where MetLife itself is

liable for negligence and breach of contract, that MetLife is not entitled to the recovery of prejudgment interest from Autorino. Moreover, an award of prejudgment interest in favor of MetLife is not warranted because MetLife has not yet paid Advest the $750,000 due and owing to Advest.

53. Accordingly, the Court hereby orders that:

(a). Advest is entitled to recover from MetLife the sum of $750,000 as damages on its third-party beneficiary breach of contract claim and its negligence claim. Advest is further entitled to pre-judgment interest on its third-party beneficiary breach of contract claim from July 7, 1998, to the present, at the rate of 9.0% per annum. N.Y. C.P.L.R. § 5004; *see Terwilliger v. Terwilliger*, 206 F.3d 240, 249 (2d Cir.2000).

(b). MetLife is entitled to recover from Autorino the sum of $750,000 as damages on its unjust enrichment and tortious conversion claims.

(c). All remaining counts of the complaint and the third-party complaint are hereby dismissed.

The Clerk shall enter judgment accordingly.

SO ORDERED.